**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

DARRYL BRIAN BARWICK,

        Petitioner,

v.                                     CASE NO.  5:12cv00159-RH

MICHAEL D. CREWS, in his
capacity as SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

        Respondent.

_____/

## ORDER DENYING THE PETITION

By petition for a writ of habeas corpus under 28 U.S.C. § 2254, Darryl Brian Barwick challenges his state-court conviction and death sentence.  This order denies relief.

I

A 24-year-old woman, identified in this order as the victim, lived in an apartment complex.  After sunbathing on the apartment-complex lawn, the victim returned to her apartment.  Someone—overwhelming evidence indicates it was Mr. Barwick—entered the victim's apartment and stabbed her with a knife 37 times,

killing her.  Later that day, the victim's sister found the body in the bathroom wrapped in a comforter.

Officers arrested Mr. Barwick.  He gave a taped confession.  Mr. Barwick said he saw the victim sunbathing, drove to his home, got a knife, walked back to the victim's apartment complex, and entered her apartment.  Mr. Barwick said he intended only to steal something, but when the victim resisted, he lost control and stabbed her.  Mr. Barwick said he continued to stab the victim as the two struggled and fell to the floor.  Mr. Barwick said that afterwards he wrapped the body in a comforter and dragged it to the bathroom.  Mr. Barwick said he later threw the knife in the lake where it was found.

The medical examiner found no evidence of sexual contact.  But a crime-laboratory analyst found a semen stain on the comforter.  The analyst testified that two percent of the population could have been the source of the semen and that Mr. Barwick was in the two percent.

## II

A grand jury indicted Mr. Barwick for first degree murder, armed burglary, attempted sexual battery, and armed robbery.

At a first trial, the jury found Mr. Barwick guilty on all counts and, on the murder conviction, recommended the death penalty by a 9-3 vote.  The judge sentenced Mr. Barwick to death.  But on direct appeal, the Florida Supreme Court

reversed, based on the prosecutor's improper consideration of race in exercising

peremptory challenges. *Barwick v. State*, 547 So. 2d 612 (Fla. 1989) ("*Barwick*

*I*").

At a second trial, a prosecution witness testified that Mr. Barwick failed a

polygraph. The judge promptly declared a mistrial.

At a third trial, the jury found Mr. Barwick guilty on all counts and, on the

murder conviction, recommended the death penalty by a 12-0 vote. The judge

sentenced Mr. Barwick to death.

The judge entered a sentencing order finding six aggravators: (1) previous

convictions for the violent felonies of sexual battery with force likely to cause

death or great bodily harm and burglary of a dwelling with an assault; (2) the

murder was committed during an attempted sexual battery; (3) the murder was

committed to avoid arrest; (4) the murder was committed for pecuniary gain; (5)

the murder was especially heinous, atrocious, or cruel; and (6) the murder was

committed in a cold, calculated, and premeditated manner without any pretense of

moral justification.

The judge found no statutory mitigators but considered nonstatutory

mitigators: Mr. Barwick suffered substantial abuse as a child and had mental

deficits. The judge's order said, "The Court does not find in this case that the

abuse received by the defendant as a child is a mitigating circumstance."

Sentencing Order at 1416-17 (Vol. 12).  In context, the order can best be understood as a ruling that the abuse, while entitled to consideration, did not outweigh the aggravators.

Mr. Barwick appealed, challenging the guilty verdict and death sentence on multiple grounds.  One was that the judge erred in rejecting as a nonstatutory mitigator the fact that Mr. Barwick had been abused as a child.

The Florida Supreme Court affirmed the conviction and sentence.  *Barwick v. State*, 660 So. 2d 685 (Fla. 1995) ("*Barwick II*").  The court agreed that Mr. Barwick's abuse as a child was a nonstatutory mitigator that the judge was required to consider.  The court said the judge's sentencing order showed that the judge did in fact properly consider the abuse.  On another issue, the court held that the "cold, calculated, and premeditated" aggravator did not apply, because Mr. Barwick did not have a careful plan or prearranged design to kill the victim.  The court concluded, though, that the improper consideration of this aggravator made no difference.  The court said that "five valid aggravators remain to be weighed against only minimal mitigating evidence," that consideration of the improper aggravator was harmless beyond a reasonable doubt, and that the death sentence was not disproportionate.  *Barwick II*, 660 So. 2d at 697.

The United States Supreme Court denied certiorari.  *Barwick v. Florida*, 516 U.S. 1097 (1996) ("*Barwick III*").

### III

Mr. Barwick filed a postconviction motion in state circuit court—the same court that conducted the trial and imposed the sentence—and amended the motion twice.  The court held an evidentiary hearing.  Among the witnesses was Dr. Hyman Eisenstein, a mental-health expert.  The court denied relief.

Mr. Barwick appealed.  He also filed in the Florida Supreme Court a separate petition for a writ of habeas corpus.  Through the postconviction motion and habeas petition, together with the direct appeal, Mr. Barwick raised all the claims he now asserts in this federal habeas petition, as well as other claims.  The Florida Supreme Court denied relief.  *Barwick v. State*, 88 So. 3d 85 (Fla. 2011) ("*Barwick IV*").

### IV

Mr. Barwick filed this timely federal habeas petition under 28 U.S.C. § 2254.  Mr. Barwick asserts seven claims: (1) his attorney rendered ineffective assistance in the trial's penalty phase by failing to adequately investigate and present mitigating evidence; (2) his attorney rendered ineffective assistance in the guilt phase by failing to cross-examine a witness, Suzanna Capers; (3) the state withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and presented false or misleading evidence in violation of *Giglio v. United States*, 405 U.S. 150 (1972); (4) the prosecutor made improper arguments to the

jury, and Mr. Barwick's appellate attorney rendered ineffective assistance by
failing to raise this issue on appeal; (5) the trial judge improperly rejected Mr.
Barwick's abuse as a child as a nonstatutory mitigator; (6) the prosecutor
improperly considered race in exercising peremptory challenges; and (7) the
Constitution prohibits Mr. Barwick's execution because he is brain damaged and
mentally impaired.

## V

A federal habeas court may set aside a state court's ruling on the merits of a
petitioner's claim only if the ruling "was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme
Court of the United States," or if the ruling "was based on an unreasonable
determination of the facts in light of the evidence presented in the State court
proceeding."  28 U.S.C. § 2254(d)(1)-(2).  A long and ever-growing line of cases
addresses these standards.  *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362 (2000);
*Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117 (11th Cir. 2012).  No purpose
would be served by repeating here all the analysis set out in the many cases.

## VI

Mr. Barwick's first claim is that his attorney rendered ineffective assistance
in the penalty phase.  Mr. Barwick faults the attorney principally in two respects.
First, Mr. Barwick says the attorney should have called an expert like the one who

testified at the postconviction hearing, Dr. Eisenstein.  Second, Mr. Barwick says some of the expert testimony his attorney introduced at the penalty phase was harmful and should have been avoided.

Mr. Barwick's attorney called in the penalty phase seven lay witnesses and seven mental-health experts.  The testimony established that Mr. Barwick endured substantial abuse as a child and had significant mental illness.  The lay witnesses included Mr. Barwick's sister, brother, half-sister, mother, and even his father.  All testified that the father physically abused Mr. Barwick, frequently and substantially.  A neighbor confirmed the abuse.  The experts noted the abuse and opined that Mr. Barwick suffered from significant mental illness.

Some of the testimony was mitigating.  Some was less so.  Evidence about mental illness and the violence it may have caused always carries a risk of prejudice.  That was true of some of the testimony introduced during the penalty phase.  And it was true of Dr. Eisenstein's testimony, too.

By presenting the penalty-phase testimony, Mr. Barwick's attorney did not render constitutionally ineffective assistance.  And having offered the testimony of seven mental-health experts, the attorney did not render ineffective assistance by failing to find an eighth who would give a similar, but perhaps somewhat more helpful, analysis.

At the postconviction hearing, Dr. Eisenstein testified, as others had during the penalty phase, that Mr. Barwick's father was abusive.  Dr. Eisenstein detailed the abuse at some length.  Perhaps responding to the sentencing court's observation that Mr. Barwick's siblings suffered abuse but did not become violent criminals, Dr. Eisenstein said Mr. Barwick suffered abuse greater than the others and internalized the trauma the most.

Dr. Eisenstein said Mr. Barwick had brain impairment.  Two of the penalty-phase experts also had said this.  Dr. Eisenstein diagnosed Mr. Barwick with intermittent explosive disorder.  One of the penalty-phase experts had given this same diagnosis.  Dr. Eisenstein disagreed with penalty-phase experts who said Mr. Barwick had antisocial personality disorder, but Dr. Eisenstein conceded that Mr. Barwick exhibited a number of the diagnostic criteria for that disorder and that reasonable psychologists could disagree on the issue.  In any event, it is by no means obvious that a jury or judge would assign greater mitigation effect to a defendant's intermittent explosive disorder than to a defendant's antisocial personality disorder; both can be mitigating but also can be viewed negatively. *See, e.g.*, *Kokal v. Sec'y, Dep't of Corr.*, 623 F.3d 1331, 1349 (11th Cir. 2010) (recognizing that a jury may negatively view antisocial personality disorder); *Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1248 (11th Cir. 2010) (same);

*Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1368 (11th Cir. 2009)

(same).

Dr. Eisenstein linked Mr. Barwick's mental deficits to the victim's murder. Most of the penalty-phase experts had not done this, and none did it as explicitly as Dr. Eisenstein.  And Dr. Eisenstein testified to statutory mitigators, concluding that Mr. Barwick was "functioning at an early adolescence stage" at the time of the murder, met "the criteria for extreme mental and emotional disturbance," and was unable to conform his conduct to the law, "due to the Intermittent Explosive Disorder, the brain impairment."  Evidentiary Hr'g Tr. at 3063-65 (Tab 37).  Only one of the penalty-phase experts had said Mr. Barwick was unable to conform his conduct to the law.

Mr. Barwick argues with some force that Dr. Eisenstein's testimony went beyond that of the seven penalty-phase experts and was not merely cumulative. But the testimony would not have changed the central facts.  Mr. Barwick endured substantial abuse and suffered from mental illness.  The abuse and illness contributed to this murder.  Still, Mr. Barwick's criminal history included a sexual-battery conviction, and he murdered this victim—a woman he did not know—for his own gratification.  He committed the murder in an especially cruel manner. Even with Dr. Eisenstein's testimony, the jury probably would have recommended

the death sentence.  And the judge still would have imposed the death sentence, as shown by his denial of collateral relief.

A claim of ineffective assistance of counsel is governed by *Strickland v. Washington*, 466 U.S. 668 (1984).  To succeed, a defendant must show both deficient performance and prejudice.

Deficient performance consists of "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Id*. at 688.

Prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id*.  The test is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id*. at 686.  When a defendant challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Id*. at 695.

For a claim based on failure to present mitigation evidence, the first question is "whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court." *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006) (citing *Grayson v. Thompson*, 257 F.3d 1194, 1225 (11th Cir. 2001)).  A court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.' "  *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams*, 529 U.S. at 397-98).

An attorney's performance is not ineffective just because the defendant is later able to locate a mental-health expert who can testify more favorably.  *See Ward v. Hall*, 592 F.3d 1144, 1173 (11th Cir. 2010) ("As we have held many times before, 'the mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.' ") (quoting *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997)).  And an attorney does not render ineffective assistance just by failing to present cumulative evidence.  *See, e.g.*, *Brown v. United States*, 720 F.3d 1316, 1327 (11th Cir. 2013) (rejecting an ineffective-assistance claim when much of the newly proffered evidence was cumulative); *Ford v. Hall*, 546 F.3d 1326, 1338 (11th Cir. 2008) ("Counsel is not

required to call additional witnesses to present redundant or cumulative
evidence."); *Marquard v. Sec'y for Dep't of Corr.*, 429 F.3d 1278, 1308 (11th Cir.
2005).

The application of these principles is illustrated by two Eleventh Circuit
decisions.  First, in *Cooper v. Secretary, Department of Corrections*, 646 F.3d
1328 (11th Cir. 2011), the defendant's mother testified in the penalty phase that the
defendant's father emotionally abused the defendant, sometimes hit the defendant
with a belt, and abused the defendant's mother.  At the state postconviction
hearing, in contrast, the defendant presented evidence that, from infancy, the
defendant suffered horrific abuse, including being slammed into a wall, beaten,
punched, and kicked by his father, and frequently being beaten by his brother.  The
Eleventh Circuit held that the trial attorney rendered ineffective assistance by
presenting in the penalty phase only a "small sliver of [the defendant's] volatile
upbringing."  *Id*. at 1355.

The situation was different in *Holsey v. Warden, Georgia Diagnostic Prison*,
694 F.3d 1230 (11th Cir. 2012).  There the evidence at the postconviction hearing
provided "more details" and "different examples" but told "largely the same
story."  *Id*. at 1266-67.  The Eleventh Circuit held that even if the attorney's
performance was deficient, the state court reasonably concluded that the defendant

suffered no prejudice.  The Eleventh Circuit thus denied relief.  And the court collected cases supporting the result.

Together, *Cooper* and *Holsey* indicate that a federal habeas petitioner is not entitled to relief on this basis when "the basic story of [the petitioner's] troubled, abusive childhood was . . . known to the jury."  *Holsey,* 694 F.3d at 1266 (internal quotation marks omitted).  *See also Johnson  v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 936-37 (11th Cir. 2011) (noting that it is quite a different story when a defendant's parents are portrayed as "cold and uncaring" than when a defendant's parents are portrayed as alcoholics and violent abusers and the defendant's home life is described as "pure hell").

Mr. Barwick's attorney presented during the penalty phase the basic story of Mr. Barwick's troubled childhood.  The attorney also presented mitigating mental-health evidence.  The evidence allowed the attorney to argue that Mr. Barwick's abusive childhood and mental illness explained his behavior and should lead to a sentence of life in prison, not death.  Mr. Barwick has not shown that the attorney rendered ineffective assistance.

In any event, Mr. Barwick has not shown prejudice.  There is no "reasonable probability that, absent the [asserted] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.  Mr. Barwick thus is not entitled to

relief.  *See Grayson v. Thompson*, 257 F.3d 1194, 1225 (11th Cir. 2001) ("Even

assuming *arguendo* ineffective assistance in the mitigating case at sentencing,

there is no reasonable probability that the balance of aggravating and mitigating

circumstances that led to the imposition of the death penalty in this case would

have been different had counsel introduced the evidence compiled and presented in

Grayson's state habeas proceedings.").

The Florida Supreme Court properly set out the law and concluded that Mr.

Barwick had shown neither deficient performance nor prejudice.  *Barwick IV*, 88

So. 3d at 100.  The ruling was not contrary to or an unreasonable application of

federal law or based on an unreasonable determination of the facts.  Mr. Barwick is

not entitled to relief on this claim.

## VII

Mr. Barwick asserts his attorney rendered ineffective assistance by failing to

challenge the testimony of Suzanna Capers.  On the day of the murder, Ms. Capers

was sunbathing at the apartment complex and saw Mr. Barwick.  She testified:

> And I saw him a couple of times, two or three or four times and I
> started getting suspicious, I never saw him come back around until
> later, a little while later he was walking in front where I was straight
> ahead of him and he stood there and he just kind of stared and I
> thought, here I am laying out and by myself and I started getting a
> little worried and he just stood there and stared at me and then he
> started pointing, he pointed at me, he pointed like this, toward her
> apartment where he was standing and he did it a few times, this
> [g]esture (indicating) and then I started getting suspicious, really
> started feeling uneasy and then he turned around and walked back

toward her apartment and I was relieved that he wasn't standing there
staring at me anymore . . . .

Trial Tr. at 232-33 (Tab 8).  Mr. Barwick's attorney did not cross-examine Ms.

Capers.

Mr. Barwick now says his attorney should have impeached Ms. Capers with

her allegedly inconsistent testimony at a deposition and the first trial and should

have proven that she had difficulty identifying Mr. Barwick at suggestive

photographic lineups.

During her earlier testimony, Ms. Capers did not express the same level of

concern about Mr. Barwick's conduct, or at least did not do so as clearly.  But the

gist of Ms. Capers's testimony was generally consistent on each occasion: Mr.

Barwick stared at her, made pointing gestures, and left.  More importantly, the

testimony made little difference.  There was no real question about the identity of

the murderer; Mr. Barwick confessed and provided details that strongly

corroborated the confession.  And Mr. Barwick's conduct was cause for concern—

as later events made clear—regardless of whether Ms. Capers was in fact

concerned.

Failing to impeach a state witness can of course constitute ineffective

assistance.  *See, e.g.*, *Nixon v. Newsome*, 888 F.2d 112 (11th Cir. 1989) (finding

ineffective assistance in failing to impeach a key state witness on matters relevant

to the identity of the shooter in a murder case); *Smith v. Wainwright*, 799 F.2d

1442 (11th Cir. 1986) (finding ineffective assistance in failing to impeach a key state witness). But asking questions for no real purpose can do more harm than good. Ms. Capers saw Mr. Barwick at the apartment complex acting strangely. After the murder, Ms. Capers may have felt lucky to be alive. Many a good defense attorney would have chosen not to pointedly cross-examine Ms. Capers about inconsequential differences in her description of the events. Indeed, after a few pointed questions, Ms. Capers might have told the jury just how she felt.

In any event, there is no basis for any suggestion that Ms. Capers's testimony—or the failure to cross-examine her—affected the outcome or reliability of the trial. The Florida Supreme Court held there was no prejudice and quoted the trial court's analysis: "there was no issue as to the identity of the killer because Barwick gave a taped statement admitting he killed [the victim] and describing his actions." *Barwick*, 88 So. 3d at 95.

The Florida Supreme Court's ruling was not contrary to or an unreasonable application of federal law or based on an unreasonable determination of the facts. Mr. Barwick is not entitled to relief on this claim.

VIII

Mr. Barwick next says the state withheld exculpatory evidence in violation of *Brady* and presented false or misleading evidence in violation of *Giglio*. The

assertions deal with evidence on two subjects: the victim's two-piece bathing suit and Ms. Capers's observations.

A

At trial, the state presented evidence that the victim's bathing-suit top was pulled down to her midriff and that her bathing-suit bottom was pulled down in the back. This evidence provided some support for the charge of attempted sexual battery, which in turn was a death-penalty aggravator.

After the trial, Mr. Barwick learned of two reports from the medical examiner's office. One described the bathing-suit bottom as "intact." The other said the bathing-suit bottom was "in place." The lead prosecutor and two investigators testified that they could not recall ever seeing the reports.

Mr. Barwick says the failure to disclose the reports violated *Brady* and that an officer's testimony that the bathing-suit bottom was pulled down in the back was false or misleading in violation of *Giglio*.

The reports should have been disclosed to the defense prior to trial. But the failure to disclose the reports plainly made no difference in the outcome of the case.

First, the evidence establishes that the undisclosed reports—if construed as Mr. Barwick now construes them, that is, to mean the bathing-suit bottom was not pulled down in the back—were wrong. In fact, as credible testimony and

photographs from the crime scene show, the bathing-suit bottom was pulled down in the back.  The state postconviction court correctly so found.  A plausible reading of the reports is fully consistent with the actual facts: "intact" meant not torn and "in place" was an accurate description of the front of the bathing-suit bottom as observed when the comforter was removed, before the body was rolled over.  *See* Evidentiary Hr'g Tr. at 3144 (Tab 37).  Disclosing the reports would have allowed the defense to make an unfounded and easily rebutted argument about the position of the bathing-suit bottom but otherwise would not have affected the trial, the verdict, or the sentence.

Second, even if the reports could somehow have led the jury to believe the bathing-suit bottom was in place in both the front and back, this would not have changed other, uncontested facts.  Mr. Barwick saw the victim sunbathing, retrieved a knife, entered her apartment, and stabbed her to death.  The victim was found with her bathing-suit top displaced, and there was semen on the comforter she was wrapped in.  This is evidence of an attempted sexual battery, regardless of the position of the bathing-suit bottom.  So the reports, even if believed and construed as Mr. Barwick now construes them, would not likely have affected the attempted-sexual-battery verdict and plainly would not have affected the murder verdict.

Third, the reports, on any view, would not have affected the death sentence. Attempted sexual battery was only one aggravator.  The defendant, whose criminal history included a conviction for sexual battery with force likely to cause death or great bodily harm, brutally stabbed to death a woman he did not know.  This was enough for a death sentence, with or without an attempted sexual battery.

A petitioner is entitled to relief under *Brady* only "if it is reasonably probable that a different outcome would have resulted if the government had disclosed the evidence." *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1292 (11th Cir. 2012).  Even if *Brady* obligated the state to disclose these reports, Mr. Barwick has not shown a reasonable probability of a different outcome.  He is not entitled to relief under *Brady*.

Mr. Barwick has shown no *Giglio* violation relating to the bathing suit.  The officer's testimony about the position of the bathing-suit bottom was true and even more clearly was not intentionally false or misleading.  Mr. Barwick is not entitled to relief on this *Giglio* claim.

## B

Mr. Barwick also says Ms. Capers's testimony at the third trial was false or misleading and that the state knew it, thus violating *Giglio*.  The assertion fails at every level.  There is no reason to believe the testimony was false or misleading. There is no reason to believe the state knew the testimony was false or misleading,

if it was.  And, as set out in section VII above, any discrepancies in the testimony

made no difference in the outcome of the case.

## C

In sum, the Florida Supreme Court properly rejected the *Brady* and *Giglio*

claims.  The ruling was not contrary to or an unreasonable application of clearly

established federal law or based on an unreasonable determination of the facts.

Mr. Barwick is not entitled to relief on these claims.

## IX

Mr. Barwick next seeks relief based on the prosecutor's allegedly improper

closing arguments during both the guilt and penalty phases.  A prosecutor's closing

argument violates the Constitution if it renders the trial "fundamentally unfair."

*Price v. Allen*, 679 F.3d 1315, 1326 (11th Cir. 2012) (quoting *Romine v. Head*, 253

F.3d 1349, 1366 (11th Cir. 2001)); *Land v. Allen*, 573 F.3d 1211, 1220 (11th Cir.

2009).   Mr. Barwick says these arguments met this standard.  And he says his

attorney rendered ineffective assistance by failing to challenge the arguments on

direct appeal.

## A

During the guilt phase, the prosecutor argued:

[Mr. Barwick] then eyes two women who are sunbathing as if to
select his victim.

> Both of them in bathing suits, sunbathing. . . . [H]e could have
> certainly picked the unoccupied dwellings to commit a burglary if he
> just wanted to steal something.
>
> . . . [W]hat did Suzann[a] Capers tell you. He stared at me and I
> got this eerie feeling. It was spooky, it was strange, it was creepy.
> That's evidence you can take into consideration as to how he was
> staring, selecting.

Trial Tr. at 550-51 (Tab 12).

Mr. Barwick says this argument was an improper attempt to scare the jury.

In fact, it was a proper argument from the evidence in the case.  One of the charges

was attempted sexual battery.  Mr. Barwick's theory was and is that he entered the

apartment to steal, not to commit a sexual battery or commit a murder.  That Mr.

Barwick stared at another sunbather in a strange manner shortly before entering the

victim's apartment was relevant on the issue of Mr. Barwick's intent.

This argument did not deprive Mr. Barwick of a fair trial.

## B

During the penalty phase, the prosecutor argued:

> I don't want you to fall into sympathy, I can't argue sympathy.  It's
> improper.  I can't sit here and show you the photograph and say, feel
> sorry for this young lady right here.  But the only reason I can show
> you this photograph in life and in death is for this one right down
> here, which is particularly heinous, atrocious and cruel.  That's the
> reason the photographs are here.  That's the reason you can look at
> them.  It is because of the pain that he inflicted, put upon her and the
> joy that he may have gotten out of it that I can talk about or I can even
> get close to these photographs or even point to these photographs or
> show these photographs to you.

Don't get me wrong.  I am not arguing sympathy but do not let the defense attorney sway you or inflame you with any sort of argument for sympathy.

The reason we're here, there's no money.  It sort of falls in the category, poor fellow.  He can't help himself, poor fellow.  Psychologists and psychiatrists can't help him.  Poor fellow.  Me, the defense lawyer, I can't help him.  Poor fellow.  All boils down to money, because that's why we can't cure him.  It is lack of ability is why we can't cure him.  Poor fellow.  Everybody has given up on him, poor fellow, don't y'all give up on him.

Don't fall into that category.  Don't fall into that sympathy.  Sympathy has no place in this courtroom.  You are to follow this law.  Do these aggravating circumstances outweigh these mitigating circumstances.  And if you have any sympathy and if sympathy just comes in there, tell yourselves, no, Mr. Paulk told me we can't have sympathy for that lady or that, the fact that she endured pain and she was being tortured.  We can take that into consideration but don't fall into that category that this man, just on the basis of sympathy, sympathy alone that you are going to vote, to recommend to the judge that he be sentenced to life in prison with a possibility of parole after 25 years in prison.  Don't let sympathy make you vote that way.

Trial Tr. at 933-34 (Tab 18).

Mr. Barwick says the prosecutor's statements about inability to argue sympathy for the victim were a backhanded way of inviting the jury to consider sympathy for the victim.  A prosecutor can of course properly point out that sympathy for the victim is not a permissible basis for imposing the death penalty. But this argument was perhaps too clever by half.  If not to invite sympathy, why would a prosecutor say, "I can't sit here and show you the photograph and say, feel sorry for this young lady right here."?

Mr. Barwick also says the prosecutor improperly told the jurors not to consider sympathy for Mr. Barwick.  In deciding whether to recommend a death sentence, a jury of course can consider any mitigating circumstance.  A jury cannot be instructed otherwise—not by the court, and not by the prosecutor.  But this does not mean jurors must be allowed to evaluate mitigation based on emotions or sympathy rather than based on the evidence.  *See, e.g.*, *Saffle v. Parks*, 494 U.S. 484, 492-94 (1990) (dictum); *California v. Brown*, 479 U.S. 538, 539 (1987) (upholding an instruction that a death-penalty jury "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling"); *id*. at 545 (O'Connor, J., concurring) ("Because the individualized assessment of the appropriateness of the death penalty is a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence, I agree with the Court that [the instruction quoted above] does not by itself violate the Eighth and Fourteenth Amendments to the United States Constitution.").

Here the court's penalty-phase instructions said this: "[T]he sentence that you recommend to the court must be one based upon the facts as you find them from the evidence and the law."  Trial Tr. at 958 (Tab 20).  Mr. Barwick does not disagree with this instruction and could not reasonably do so.  The instructions did not mention sympathy.

The prosecutor's comments to the jury on sympathy for Mr. Barwick are problematic at several levels.  First, a jury should get any applicable instruction on the law from the court, not from an attorney.  An attorney may properly comment on and suggest the proper application of the court's instructions, but an attorney has no business instructing the jury on the law in a way that goes beyond the court's instructions.  That is in effect what the prosecutor did here.  Second, when instructions are compiled and given following the proper procedures—when each side has an opportunity to be heard in advance and the final instructions are read to the jury by the judge—the instructions can be delivered far more completely, precisely, and impartially than an attorney ordinarily can manage during a closing argument.

This does not mean, though, that this prosecutor's comments on sympathy for Mr. Barwick were unconstitutional.  In this portion of the argument, the prosecutor spoke with a high level of precision.  He should not have taken it upon himself to instruct the jury on the law.  But it is not at all clear he misstated the law.

For four reasons, Mr. Barwick is not entitled to relief based on the prosecutor's arguments addressing sympathy for the victim or for Mr. Barwick.

First, the primary thrust of this part of the prosecutor's argument was unobjectionable.  The primary thrust was this: you may consider the nature of the

crime and the pain inflicted on the victim, though not sympathy for the victim, and you should not let sympathy for Mr. Barwick cause you to recommend a life sentence.

Second, the prosecutor's comments on sympathy for the victim could not have made a difference.  What happened to the victim happened.  The jury knew the facts and was entitled to consider them.  The jury undoubtedly considered the nature of the crime and would have done so even had the prosecutor never mentioned the subject.  And the jury's consideration of the nature of the crime was proper; one issue was whether the crime was heinous, atrocious, or cruel.  All of this made more academic than real any distinction between *sympathy* for the victim, on the one hand, and consideration of the evidence of what *happened* to the victim, on the other hand.

Third, the prosecutor's comments on sympathy for Mr. Barwick also could not have mattered.  The jury was entitled to consider Mr. Barwick's childhood and mental condition and undoubtedly did so.  The prosecutor did not suggest that the jury should not consider those circumstances.  Aside from those circumstances and his age (he was 19), there was nothing very sympathetic about Mr. Barwick.

Fourth, the prosecutor's comments on sympathy were a fleeting portion of a much longer trial.  The judge properly instructed the jury to weigh any statutory aggravators against any mitigators and to make its death-sentence recommendation

based on the facts as found from the evidence.  There is no reason to doubt that the jury did this precisely as it should have done.

Mr. Barwick is not entitled to relief based on this part of the closing argument.

C

Mr. Barwick claims that his attorney rendered ineffective assistance on appeal by failing to raise as an issue the prosecutor's comments during both the guilt and penalty phases.  The claim fails in four respects.

First, as set out above, the prosecutor's guilt-phase argument was proper.  A contemporaneous objection would properly have been overruled.  And, as the Florida Supreme Court made clear when it rejected this claim on collateral review, a claim on direct appeal would have failed even had there been a contemporaneous objection.  *Barwick IV*, 88 So. 3d at 109-10.  Mr. Barwick did not receive ineffective assistance on this issue either at trial or on appeal.

Second, Mr. Barwick's attorney raised the penalty-phase issue on direct appeal, exactly as Mr. Barwick now says the attorney should have done.  Mr. Barwick's assertion that the attorney did not raise the issue is simply wrong.  The Florida Supreme Court rejected the claim on direct appeal because there had not been a contemporaneous objection during the closing argument.  An attorney does

not render ineffective assistance when the attorney properly presents a claim but the court rejects it.

Third, on the merits, the prosecutor's penalty-phase argument was more problematic, but a contemporaneous objection probably still would have been overruled. *See, e.g.*, *Valle v. State*, 581 So. 2d 40, 47 (Fla. 1991) ("The state may properly argue that the defense has failed to establish a mitigating factor and may also argue that the jury should not be swayed by sympathy."). And even had there been a contemporaneous objection, the claim would have failed on direct appeal, as the Florida Supreme Court made clear when it held, on collateral review, that the argument was proper. *Barwick IV*, 88 So. 3d at 110.

Fourth, as set out in section VI above, a petitioner can obtain relief on an ineffective-assistance claim only by showing both deficient performance *and* prejudice. Mr. Barwick has shown neither.

## D

The Florida Supreme Court's rejection of Mr. Barwick's claims based on the prosecutor's closing arguments was not contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts. Mr. Barwick is not entitled to relief on these claims.

X

Mr. Barwick next claims the sentencing judge improperly rejected as a nonstatutory mitigator Mr. Barwick's history of abuse as a child.  Under *Eddings v. Oklahoma*, 455 U.S. 104 (1992), a capital sentencer must consider all mitigating circumstances, including a history of abuse as a child.  The state does not contend otherwise.

The judge's sentencing order said:

> The evidence establishes that the defendant was abused as a child by his father and grew up in a dysfunctional family.  The evidence also establishe[s] that the defendant's siblings were likewise abused and they apparently grew up to be responsible persons.  Two of the siblings had the unfortunate experience of being compelled to testify against their brother.  While there are doubtless numerous cases where the abuse received by children influence their actions in adult life and result in or contribute to criminal behavior[,] [t]he Court does not find in this case that the abuse received by the defendant as a child is a mitigating circumstance.

Sentencing Order at 1416-17 (Volume 12).

On one reading, this was an improper refusal to consider as a mitigator Mr. Barwick's history of abuse.  But on another reading, this was only a statement that the history of abuse was not sufficiently mitigating to outweigh the aggravators.

The sentencing order also said:

> The Court has considered and weighed each of the applicable aggravating circumstances and each of the statutory and non-statutory mitigating circumstances that are established by the evidence or on which there has been any significant evidence produced as they relate to the murder charge.  Further, the Court has considered whether the

established facts are such that in all fairness, taking into consideration the totality of the defendant's life or character are sufficient to counter-balance the aggravating circumstances.  The jury in this case was unanimous in recommending the death penalty.  The Court has carefully considered and reviewed all of the foregoing as it relates to the murder charge and determines that sufficient aggravating circumstances exist to support the recommendation of the jury and that recommendation is not counter-balanced by the mitigating circumstances.

*Id*. at 1417-18.

On appeal, the Florida Supreme Court said:

We have held that a trial court must find as a mitigator each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence.  *Campbell v. State*, 571 So. 2d 415, 419 (Fla. 1990).  We have also expressly recognized an abused or deprived childhood as one factor that is mitigating in nature.  *Id*. at 419 n. 4.  In addition, the judge here recognized that evidence established that Barwick was abused as a child.  Consequently, this abuse was an appropriate mitigating circumstance for the court to consider.

*Barwick II*, 660 So. 2d at 696.

The Florida Supreme Court concluded that the sentencing judge *had* properly considered Mr. Barwick's abuse: "Although the trial court judge stated that he did not consider Barwick's history of child abuse a mitigating factor, we find that the sentencing order indicates that the judge properly considered evidence of abuse in imposing the death sentence."  *Id.*

This is a reasonable view of the sentencing order.  Indeed, in context, this is the best view of the sentencing order.  An experienced judge presided over the trial

and wrote an order specifically addressing Mr. Barwick's history of abuse as a child.  The order said that the aggravators, which on any view were substantial, outweighed "the mitigating circumstances."  The judge thus recognized that there *were* mitigating circumstances.  Those circumstances were the history of abuse and related mental and emotional deficits.  But the aggravators were more substantial, as the jury, judge, and Florida Supreme Court all held.

The Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.  Mr. Barwick is not entitled to relief on this claim.

## XI

Mr. Barwick claims that the prosecutor improperly considered race in exercising a peremptory challenge of an African American juror.  If this happened, it was a violation of clearly established federal law.  *See, e.g.*, *Batson v. Kentucky*, 476 U.S. 79 (1986).

The Florida Supreme Court held that this claim was procedurally barred. *Barwick II*, 660 So. 2d at 690 n.10.  Mr. Barwick objected when the prosecutor exercised the challenge, but when the entire jury had been selected, Mr. Barwick did not renew the objection or otherwise challenge the panel.  Under regularly followed Florida law, an objection to an allegedly race-based peremptory challenge

"is not preserved for appellate review if the party objecting to the challenge fails to renew the objection before the jury is sworn." *Zack v. State*, 911 So. 2d 1190, 1204 (Fla. 2005); *see also Carratelli v. State*, 961 So. 2d 312, 318-19 (Fla. 2007); *Joiner v. State*, 618 So. 2d 174, 176 (Fla. 1993).  In his reply in this court, Mr. Barwick seems to acknowledge this.

A petitioner may obtain relief in this court on a procedurally defaulted claim only on a showing of cause for and prejudice from the default.  *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Mr. Barwick has shown neither.

Alternatively, the Florida Supreme Court said this claim was unfounded on the merits because the prosecutor provided legitimate race-neutral reasons for the peremptory challenge.  One was this: the juror's cousin was discharged from the sheriff's department for substance abuse.  This, without more, does not warrant striking the juror for cause, but it easily qualifies as a legitimate nondiscriminatory reason for a peremptory strike.  The Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.

On both procedural grounds and the merits, Mr. Barwick is not entitled to relief on this claim.

XII

In *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court held it

unconstitutional to execute a defendant for committing a crime before age 18.  Mr.

Barwick was 19 when he committed this murder.  But he says his mental or

emotional age was below 18 as a result of brain damage and his father's abuse.

 The Florida Supreme Court rejected this claim, holding, as it had held

previously, that *Roper* turns on the defendant's chronological age, not on the

defendant's mental or emotional age.  *Barwick IV*, 88 So. 3d at 106 (citing *England

v. State*, 940 So. 2d 389, 406-07 (Fla. 2006)); *see also Hill v. State*, 921 So. 2d 579,

584 (Fla. 2006) ("*Roper* only prohibits the execution of those defendants whose

chronological age is below eighteen.").

The United States Supreme Court has not extended *Roper* to mental or

emotional age.  The Florida Supreme Court's rejection of Mr. Barwick's claim

thus was not contrary to "clearly established Federal law, as determined by the

Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  *See Dombrowski v.

Mingo*, 543 F.3d 1270, 1274 (11th Cir. 2008) (holding that a state decision on an

issue cannot be contrary to federal law under § 2254(d)(1) if there is no Supreme

Court decision on point).

The Florida Supreme Court's rejection of Mr. Barwick's claim also was not

an unreasonable application of *Roper*.  In *Roper*, the United States Supreme Court

drew a bright line—age 18.  The Court squarely held that executing a defendant for committing a crime before age 18 is always unconstitutional, no matter how mature the defendant.  A reasonable application of *Roper* is that the bright line works the other way, too—executing an individual for committing a crime after age 18 is not, just because of age, unconstitutional.  Mental or emotional age may be a mitigating factor, but it does not necessarily preclude the death penalty.

Because the Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law, Mr. Barwick is not entitled to relief.

## XIII

A district court must "issue or deny a certificate of appealability when it enters a final order adverse to" a § 2254 petitioner.  Rule 11(a) of the Rules Governing § 2254 Cases in the U.S. Dist. Ct.  A certificate of appealability may be issued only if a petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see Miller-El v. Cockrell*, 537 U.S. 322, 335-38 (2003) (explaining the meaning of "substantial showing"); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (same); *see also Williams*, 529 U.S. at 402-13 (setting out the standards applicable to a § 2254 petition on the merits).  As the Court said in *Slack*:

> To obtain a COA under § 2253(c), a habeas prisoner must make a
> substantial showing of the denial of a constitutional right, a

> demonstration that, under *Barefoot*, includes showing that reasonable
> jurists could debate whether (or, for that matter, agree that) the
> petition should have been resolved in a different manner or that the
> issues presented were "adequate to deserve encouragement to proceed
> further."

*Slack*, 529 U.S. at 483-84 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4

(1983)).

Mr. Barwick has made the required showing on only a single issue: whether

his attorney rendered ineffective assistance related to mitigation evidence during

the penalty phase.  This order grants a certificate of appealability on that issue.  To

ensure that Mr. Barwick has an opportunity to be heard on the certificate-of-

appealability issue, he may—but need not—move to reconsider the denial of a

certificate on any other issue.

XIV

The Florida Supreme Court's rejection of Mr. Barwick's claims was not

contrary to or an unreasonable application of federal law or based on an

unreasonable determination of the facts in light of the evidence presented in state

court.  Mr. Barwick is not entitled to relief.  Accordingly,

IT IS ORDERED:

1. The clerk must enter judgment stating, "The petition is DENIED with

prejudice."

2. A certificate of appealability is GRANTED on this issue: whether Mr.

Barwick's attorney rendered ineffective assistance related to mitigation evidence

during the penalty phase.  A certificate of appealability is denied on any other

issue.

3. The clerk must close the file.

SO ORDERED on March 19, 2014.

s/Robert L. Hinkle_____
United States District Judge